# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-SA-01068-COA

**EEECHO INC., ANOINTED TEMPLE AOH CHURCH, JOHN JOHNSON, GLENN COBB, LATTIE GRUBBS, AND NORTH GULFPORT COMMUNITY LAND CONSERVANCY, INC.**                    APPELLANTS

**v.**

**MISSISSIPPI ENVIRONMENTAL QUALITY PERMIT BOARD AND MISSISSIPPI STATE PORT AUTHORITY AT GULFPORT**                    APPELLEES

DATE OF JUDGMENT:            09/16/2022
TRIAL JUDGE:                 HON. JAMES B. PERSONS
COURT FROM WHICH APPEALED:   HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANTS:    JOSHUA FIYENN TOM
                             RODRIGO CANTU
                             JENNIFER ANNE POWIS
ATTORNEYS FOR APPELLEES:     MICHAEL BRANT PETTIS
                             ROY FURRH
                             BEN HARRY STONE
                             SCOTT A. JOHNSON
                             BRADLEY AARON ENNIS
                             SUSAN MARIE SCAGGS
NATURE OF THE CASE:          CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                 AFFIRMED - 02/13/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., GREENLEE AND McCARTY, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.    The Mississippi State Port Authority (MSPA) developed plans to construct a storage facility for equipment and cargo for United States Department of Defense (DOD) shipments at the North Port Property in Gulfport, Mississippi.  Because the proposed project involved

filling 3.15 acres of federal wetlands, MSPA was required to obtain a water quality certification from the Mississippi Department of Environmental Quality (MDEQ) and a federal permit from the United States Army Corps of Engineers (Corps).[1]

¶2.     MDEQ's Permit Board issued a water quality certification to MSPA, and two companies, a church, and three residents (the Appellants)[2] appealed to the Harrison County Chancery Court, which affirmed the Permit Board's decision.  On appeal before this Court, the Appellants claim that (1) the Permit Board erred by not making factual findings about the possible storage of explosive ammunition at the site; (2) the joint public notice and public hearing notice were deficient; (3) the Permit Board did not articulate a rational basis for its decision that the North Port Property was preferable to alternative project sites; and (4) the Permit Board erred by failing to ensure that an environmental justice review was conducted before issuing the water quality certification.  After review, we affirm.

## FACTS AND PROCEDURAL HISTORY

### I.     Joint Application and Notice

---

[1] In *Sackett v. Environmental Protection Agency*, 598 U.S. 651, 678-79 (2023), the United States Supreme Court recently limited Clean Water Act jurisdiction over wetlands. During appellate oral arguments, however, it was asserted that no new jurisdictional wetland decision had been made since the Supreme Court's decision.

[2] John Johnson, Glenn Cobb, and Lattie Grubbs lived in the neighborhoods that would be most affected by the proposed project; the Apostolic Church was located adjacent to the proposed project site; and the North Gulfport Community Land Conservancy had an interest in preventing environmental degradation and the filling of wetlands in the North Gulfport Community.  The record suggests that EEECHO Inc. did not become a party until around the time the case was appealed to the chancery court.  For readability, we will refer to the parties as "the Appellants" throughout this opinion.

¶3.     In 2018, MSPA submitted a "Joint Application and Notification" to (1) MDEQ for a water quality certification, (2) the Corps for a federal permit, and (3) the Mississippi Department of Marine Resources for a "Coastal Zone Consistency Determination." Subsequently, the agencies issued a "Joint Public Notice" and invited the public to submit comments.

## II.     Factors for Application Decisions and Alternatives Analysis

¶4.     In a document titled "Factors for Application Decision . . . ," MSPA noted that the Permit Board must consider eleven factors when determining whether to grant or deny a state water quality certification.  *See* 11 Miss. Admin. Code Pt. 6., R. 1.3.4 (adopted Aug. 24, 2013).  The factors included "Feasible alternatives to the activity." *Id.*  MSPA also provided an "Alternatives Analysis," explaining that MSPA had considered feasible alternatives, or alternative project sites, using the following Alternatives Screening Criteria:

1.     Is there rail access?

2.     Would new rail access have to be built?

3.     Is there access to the major highway transportation network?

4.     What is the distance from the Port to the new DOD storage facility?

5.     Is there a laydown area of sufficient size to meet the needs of the project?

6.     What are the environmental conditions?

7.     Is it in the 100-year floodplain?

Ultimately, MSPA concluded that the North Port Property was the preferred project site.

3

### III.     Public Notice and Hearing

¶5.     In 2019, the MDEQ published notice with a draft water quality certification and invited the public to submit written comments.  Additionally, the public was invited to a public hearing.  At the hearing, the attendees discussed, among other things, the impact of the project, feasible alternatives, and environmental justice considerations.  Thereafter, MDEQ staff prepared responses to the comments.

### IV.     Review Rationale and Revised Alternatives Analysis

¶6.     MDEQ also requested from MSPA additional information, and MSPA provided a "Revised Alternatives Analysis." In its analysis, MSPA considered the following project site locations: North Port, Deep-Water Port, Inland Port, Seabee Base, and a no-action alternative.  MSPA reiterated that the North Port Property was still the preferred project site.[3]

### V.     Evidentiary Hearing and the Permit Board's Decision

¶7.     In August 2019, the Permit Board issued a state water quality certification to MSPA. Subsequently, the Appellants requested an evidentiary hearing so the Permit Board could reconsider its decision.  Before the hearing, MDEQ submitted pre-filed testimony through the affidavits of Florance Bass and Thomas Wallace.  MSPA submitted pre-filed testimony through the affidavits of Jonathan Daniels, Paul Bradley, Christina Shurley, John Webb, and John Szabo.  The Appellants submitted pre-filed testimony through the affidavits of Steven

---

[3] MSPA also provided a "Review Rationale" in which it discussed the feasible alternatives.

4

Emerman, Earthea Nance, and David Padgett. Additionally, all witnesses were available for questioning during the hearing.

¶8.     The following witnesses testified about the feasible alternatives: Bass (an environmental engineer for MDEQ), Daniels (the CEO and Executive Director of MSPA), Bradley (a consultant who assisted MSPA with the certification process), and Webb (MSPA's director of engineering).

### *The North Port Property*

¶9.     During the evidentiary hearing, testimony was presented that the North Port Property would allow MSPA to most effectively achieve the project objective and project purpose while protecting environmental resources. The North Port Property was described as a 140-acre parcel that was located two miles north of the existing Port of Gulfport. The North Port Property was zoned for industrial use, undeveloped, and accommodated the size of the project. Testimony was presented that on-site alternatives were considered, but it was determined that the best location for the project site was on 16 acres south of a capped area to minimize the impact to wetlands.[4] It was noted that the North Port Property was adjacent to an active rail line and provided a link to Camp Shelby, which was the primary DOD facility that MSPA would support as a strategic seaport. However, a rail spur would need

---

[4] Gulfport Fertilizer Company formerly operated a portion of the North Port Property. During an assessment, lead and arsenic contamination was detected. As a result, the contaminated portion of the site was capped with a ten-inch layer of clay. The 16-acre project site would be located approximately south of the capped area, and MSPA would maintain a 200-foot buffer between the capped area and the project site.

to be constructed. Additionally, although a major highway transportation network—U.S. Highway 49 and Interstate 10—was nearby, a "connector" would have to be constructed. Finally, testimony was presented that the North Port Property was not in the 100-year floodplain or in a coastal high hazard area.

### *The Deep-Water Port*

¶10. Several criteria favored the Deep-Water Port as a feasible alternative. Testimony was presented that the Deep-Water Port had access to highway transportation networks and railways, no additional spurs needed to be built, and no wetlands would be impacted. However, testimony was presented that the Deep-Water Port was unavailable. Bass testified that MSPA was in negotiations with a potential operator for the only terminal without a tenant. Similarly, Daniels testified that the four of the five terminals at the Deep-Water Port were committed to leases ranging in length from 15 to 60 years, and MSPA was in exclusive negotiations for the remaining terminal. As a result, Daniels suggested that selecting the Deep-Water Port as the project site would result in litigation. Furthermore, testimony was presented that the Deep-Water Port was located in a coastal high hazard area and in the 100-year floodplain. Finally, Bass testified that it was not essential for the marshalling area associated with the project to be located at the Deep-Water Port and that the Deep-Water Port would be more appropriately used to support deep draft-water-dependent activities.

### *The Inland Port*

¶11. MDEQ asked MSPA to reconsider the Inland Port after the public comment period.

6

However, testimony was presented that the Inland Port was currently leased to a tenant. Additionally, the Inland Port was not adjacent to a mainline railroad track, and a railroad spur would have to be constructed across Seaway Road. The Inland Port also had greater highway travel distance. And the Inland Port contained wetlands and was in the 100-year floodplain. Finally, testimony was presented that the proposed project would not be the best use of the Inland Port.

### The Seabee Base

¶12. The Seabee Base was considered for the first time after the public comment period. However, testimony was presented that the Seabee Base was located in an industrial complex that was highly developed and limited in space. Additionally, the base did not have operational rail access, and the old rail system was in need of repair.

### No-Action Alternative

¶13. Finally, testimony was presented that a no-action alternative was considered. However, the no-action alternative would have negated the use of the Port of Gulfport as a strategic port.

¶14. During the hearing, testimony was also presented about environmental justice considerations. The Appellants' counsel acknowledged that the Permit Board was not required to consider environmental justice. Nevertheless, testimony was presented that environmental justice was taken into consideration throughout the administrative process. Bass testified that MDEQ reviewed the project with sensitivity to the area and considered

7

community concerns, solicited comments regarding the proposed project, conducted a public hearing, implemented enhanced community engagement, and provided the community's comments to the Permit Board. He also testified that MSPA designed the project to be environmentally protective of the community.

¶15. After considering the pre-filed written testimony, oral testimony, documentary evidence, and arguments of legal counsel, the Permit Board explained its decision to affirm the issuance of the state water quality certification in twenty-four pages of findings of fact and conclusions of law. The Permit Board supported its decision by citing to the evidence that it relied on to reach that decision.

## VI. Appeal to the Chancery Court

¶16. The Appellants appealed the Permit Board's decision to the chancery court and raised the following issues relevant to this appeal: (1) whether the Permit Board's failure to investigate the risks associated with the possible storage of explosive ammunition was erroneous, (2) whether the Permit Board's approval of the North Port Property over the alternative project sites was erroneous, and (3) whether the Permit Board should have conducted an environmental justice review before issuing the water quality certification. After a hearing, the chancellor affirmed the Permit Board's decision.

## STANDARD OF REVIEW

¶17. This Court "reviews a chancery court's decision regarding an agency's action under the same standard of review that the chancery court was bound to follow." *Davis v. Guido*,

308 So. 3d 874, 878 (¶9) (Miss. Ct. App. 2020) (citing *Giles v. Shaw Sch. Dist.*, 203 So. 3d 1165, 1169 (¶12) (Miss. Ct. App. 2016)). "An agency's decision will not be disturbed on appeal absent a finding that it '(1) was not supported by substantial evidence, (2) was arbitrary or capricious, (3) was beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party." *Gussio v. Miss. Real Est. Comm'n*, 122 So. 3d 783, 786 (¶10) (Miss. Ct. App. 2013) (quoting *McDerment v. Miss. Real Est. Comm'n*, 748 So. 2d 114, 118 (¶9) (Miss. 1999)). "Substantial evidence is something more than a scintilla of evidence, yet less than a preponderance of the evidence." *Miss. Comm'n on Env't Quality v. Bell Utils. of Miss. LLC*, 135 So. 3d 868, 877 (¶24) (Miss. 2014) (*Sierra Club v. Miss. Env't Quality Permit Bd.*, 943 So. 2d 673, 678 (¶11) (Miss. 2006)). "[A]n action is arbitrary or capricious if the agency entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

¶18. This appeal is to be "considered only upon the record as made before the Permit Board." Miss. Code Ann. § 49-17-29(5)(b) (Supp. 2018). "A rebuttable presumption in favor of the agency's decision exists." *Davis*, 308 So. 3d at 878 (¶9) (quoting *Boyles v. Miss. State Oil & Gas Bd.*, 794 So. 2d 149, 152 (¶6) (Miss. 2001)). "Therefore, the burden to prove that the court should overturn the agency's decision . . . is placed on the party challenging the decision." *Id.* at 878-79 (¶9) (citing *Ray v. Miss. Dep't of Pub. Safety*, 172

9

So. 3d 182, 187 (¶16) (Miss. 2015)).

## DISCUSSION

### I. Whether the Permit Board erred by not making factual findings regarding the possible storage of explosive ammunition.

¶19. The Appellants claim that a Port Planning Order (PPO) dated December 1, 2017, showed that the project would include the storage of explosive ammunition. They argue that because the Permit Board did not make factual findings as to the storage of explosive ammunition, the Permit Board's decision to issue the water quality certification was arbitrary and capricious and was not supported by substantial evidence.

¶20. In response, MDEQ asserts that this issue is barred. The Appellants stated in their request for an evidentiary hearing, "Depending on what is stored . . . and how it is stored, a degree of treatment may be required to protect the State's waters and human health and welfare from chemicals, ammunition, industrial wastes and solids that would travel from the site via surface water and the air." However, the Appellants did not present any evidence regarding ammunition at the hearing, and the PPO was not introduced into evidence.

¶21. At the evidentiary hearing, the hearing officer allowed the Appellants to ask general questions about certain documents, including the PPO, that were not filed before the hearing. Although the Appellants' counsel questioned a witness about the PPO, counsel did not question any witnesses about the reference in the PPO to the possible storage of ammunition. Additionally, it does not appear that the Appellants attempted to introduce the PPO into evidence during the hearing. As stated, this appeal "shall be considered only upon the record

10

as made before the Permit Board." Miss. Code Ann. § 49-17-29(5)(b).

¶22. Notwithstanding any waiver, it is evident from the record that the PPO was "a non-binding letter of intent" and merely expressed a preference. As the chancellor noted, ammunition was mentioned once in an administrative record that consisted of more than 3,000 pages. The PPO was stamped: "THIS ORDER IS ISSUED FOR PLANNING PURPOSES ONLY." It further stated that it was "a notification of a *tentative* arrangement to meet anticipated defense agency requirements." (Emphasis added). Enclosed with the PPO was a document that indicated that a "suggested requirement" included the "[c]apability (preferred) to handle 3,500 to 377,000 lbs of net explosive weight . . . of 1.1 ammunition . . . ." This was not considered a "Must-Have." Additionally, the enclosure was "only intended to help inform port staff of the various criteria that [was] consider[ed] important when determining adequate PPO facilities." The enclosure did not require "anything other than adequate berthing facilities, staging areas, and rail spurs . . . ."

¶23. The Permit Board made adequate findings regarding the proposed use of the North Port Property. In its findings of fact and conclusions of law, the Permit Board explained that the North Port Property would be used "as a storage lot for equipment and cargo to support DOD shipments." And "[s]hipments of cargo from the Port of Gulfport will be offloaded from the ship, transferred to truck or rail, and shipped out from the North Port Property or vice versa." Furthermore, the Permit Board considered the potential impacts to water quality during project operations and required MSPA to comply with the Baseline Stormwater

11

General Permit.

¶24. "[T]his Court does not require administrative agencies to exhaustively discuss in their findings every bit of evidence presented for their consideration." *Sierra Club*, 943 So. 2d at 681 (¶27). "Rather, the agency's findings must be specific enough to allow this Court to evaluate whether the decision is supported by substantial evidence." *Id*. Here, the reference to the possible storage of ammunition in the PPO was not presented to the Permit Board for its consideration at the evidentiary hearing. And there was no final determination that ammunition would be stored. After review, we find that the Permit Board's decision was supported by substantial evidence.[5]

**II.      Whether the joint public notice and public notice were deficient.**

¶25. Next, the Appellants claim that the joint public notice and public notice did not comply with statutory and regulatory requirements regarding the content of public notices and that the Permit Board's failure to issue a new public notice was arbitrary and capricious. Specifically, the Appellants take issue with the notices because they did not mention the possible storage of ammunition that was referenced in the PPO.

¶26. According to the applicable regulations, "Public notice may be accomplished

---

[5] The Appellants cite Mississippi Code Annotated section 49-17-29(3)(c) in support of their argument that "[the Permit Board] had the legal obligation to require the submission of any specifications, plans, and information about [the designation as a strategic port] . . . ." However, this statute states: "The Permit Board . . . *may* require the submission of those plans, specifications and other information as it deems necessary to carry out Sections 49-17-1 through 49-17-43 and Title 17, Chapter 17, or to carry out the commission's regulations adopted under those sections." Miss. Code Ann. § 49-17-29(3)(c) (emphasis added).

12

through . . . a joint public notice between the federal and/or state agency and the Department . . . ." 11 Miss. Admin. Code Pt. 6, R. 1.3.3.A (adopted Aug. 24, 2013). "The application for certification shall be the public notice . . . ." *Id.* at Pt. 6., R. 1.3.2(A) (adopted Aug. 24, 2013). To be deemed complete, all applications shall contain, among other things:

> (2) a complete description of the proposed activity, including the location, adjacent water body(s), purpose and intent of the project, maps, drawings, and plans (detailed engineering plans and specifications are not required);

> (3) a description of all proposed discharges and/or other activities associated with the proposed activity, including planned or proposed future development by the applicant;

*Id.* The Appellants assert that the notice in this case did not comply with either of these requirements.

¶27. However, the joint public notice described the project as follows:

> LOCATION: In waters of and wetlands abutting Turkey Creek, Section 33, Township 7 South, Range 11 West, Gulfport, Harrison County, Mississippi (Latitude 30.3918 North, Longitude 89.0967 West).

> WORK DESCRIPTION: The applicant proposes filling 3.15 acres of wetlands for the creation of a rail spur, staging lots, and a security fence in support of [DOD] shipments. The applicant is seeking a 5-year authorization.

> PROJECT PURPOSE: The proposed activity is the creation of a rail spur in support of [DOD] shipments.

The joint public notice complied with the applicable regulations, and it was not deficient simply because it did not mention the single reference to explosive ammunition in the PPO.

¶28. Additionally, MDEQ provided additional notice of the proposed project in a public

13

notice.  The public notice described the project as follows:

> The proposed project site, known as the North Port Property, is located north of the existing Port of Gulfport in waters adjacent to Turkey Creek and Brickyard Bayou and consists of approximately 16 acres, of which 3.15 acres are freshwater wetlands.  The applicant proposes to conduct regulated activities in waters of the State for the creation of a rail spur, paved storage lots, high security fencing, site lighting, electrical duct bank, detention basin, and drainage swales.  The purpose of this project is to provide a storage lo[t] for equipment and cargo in support of [DOD] shipments.  The proposed project would result in the placement of fill material in 3.15 acres of jurisdictional wetlands.  Mitigation activities for the unavoidable losses of waters of the State would be achieved through the purchase of credits from an approved wetland mitigation bank.

For these reasons, the failure to issue a revised public notice was not arbitrary or capricious.

### III.     Whether the Permit Board articulated a rational basis for its decision that the North Port Property was preferable to the alternative project sites.

¶29.    The Appellants claim that the Permit Board did not articulate a rational basis for its decision that the North Port Property was preferable to the alternative project sites. According to the Appellants, the Permit Board accepted MSPA's conclusory statements in its joint application, alternatives analyses, and review rationale without conducting its own analysis.  Therefore, the Appellants argue that the Permit Board's decision was not supported by substantial evidence and was arbitrary and capricious.[6]

¶30.    According to the Appellants, "this Court cannot possibly ascertain how the Permit Board arrived at its decision to reject the [Deep-Water Port, Inland Port, and Seabee Base in

_____

[6] MDEQ notes that the Appellants had the opportunity to submit comments to the proposed findings of fact and conclusions of law but failed to do so.

14

favor of the North Port Property].” We will address the Permit Board's findings as to each of the feasible alternatives.

### The Deep-Water Port

¶31. In its findings of fact and conclusions of law, the Permit Board found that the Deep-Water Port was "highly developed" and mentioned that it lacked the necessary space for the project. Importantly, the Permit Board noted that MSPA was in negotiations with a potential terminal operator for the only available terminal at the Deep-Water Port. Furthermore, the Permit Board found that the Deep-Water Port was located in the coastal high hazard area, the 100-year floodplain, and a storm surge zone. And the proposed project would not be the best use of the Deep-Water Port.

¶32. Although testimony at the evidentiary hearing showed that the criteria regarding rail access and highway transportation access favored the Deep-Water Port, the Permit Board explained why the Deep-Water Port was not a viable option. The Permit Board cited to the testimony that it relied upon, and substantial evidence supported the Permit Board's findings.

### The Inland Port

¶33. Similarly, the Permit Board found that the Inland Port was under a lease. But even if the Inland Port had been available, the Permit Board found that a major portion of the property was occupied by buildings, parking lots, roads, and other facilities. The Inland Port was not adjacent to an active mainline railroad track, and a rail spur would have to have been constructed across a four-lane road. Additionally, highway transportation would add to road

15

congestion. The Inland Port contained wetlands and was in the 100-year floodplain. Finally, the Permit Board concluded that the project would not be the best use of the Inland Port. Again, the Permit Board's findings were supported by substantial evidence.

### *The Seabee Base*

¶34. Next, the Permit Board noted that MDEQ asked MSPA to evaluate the Seabee Base as a feasible alternative. However, the Permit Board found that the Seabee Base was an industrial complex that was "highly developed and limited in space." As a result, it would have been "extremely difficult" to provide a dedicated area to meet DOD's storage requirements. Furthermore, the Permit Board found that the Seabee Base did not have operational rail access from a main rail-line system, the rail system had not been used in recent years, and the rail system was not certified. Although the Permit Board did not make any findings as to whether the Seabee Base had access to a major highway transportation network, the Permit Board explained why the Seabee Base was not a practical project site location. And the Permit Board's findings were supported by substantial evidence.

### *The North Port Property*

¶35. The Permit Board found that the North Port Property was zoned for industrial use, vacant, and undeveloped. Although the Permit Board did not discuss highway transportation access, the Permit Board noted that the site was adjacent to a mainline railroad track that was "very active" and that cargo could be transported on the trains currently passing through the area. Furthermore, the Permit Board found that the railroad provided a link to Camp Shelby,

16

and Daniels testified that this was a "primary driver" for the decision to use the North Port Property.

¶36. Ultimately, the Permit Board stated, "[g]iven the potential for impacts to waters of the state, the [North Port Property] was determined to be the best alternative that would achieve the project purpose and need while protecting environmental resources." The Permit Board further explained that the "[a]lternatives were not feasible alternatives because they were not 'available and capable of being carried out after taking into consideration cost, existing technology, and logistics in light of overall project purposes.'" Additionally, the Permit Board noted the fact that "while there [would] be environmental impacts associated with the project, the [water quality c]ertification requir[ed] MSPA to mitigate its impacts in a manner that [would] eliminate unreasonable degradation."

¶37. The Appellants argue that because the Permit Board "adopted certain conclusions" from MSPA's joint application, alternatives analyses, and review rationale, the Permit Board did not make its own findings or conduct its own analysis of the evidence. The Appellants rely on *Mississippi Sierra Club Inc. v. Mississippi Department of Environmental Quality*, 819 So. 2d 515 (Miss. 2002), in support of their argument. In *Sierra*, "[u]nder the factor 'feasible alternatives to the activity,' the Commission's only rationale was the following: 'The Corps evaluated the . . . purchase of flowage easements and determined that not only was this alternative cost prohibitive, but also the option would not accomplish the purpose of the project.'" *Id*. at 523 (¶29). Our supreme court held, "Due to the lack of findings and

17

explanation in the order, we are unable to determine whether the Commission's decision was supported by substantial evidence or was arbitrary or capricious." *Id*. at (¶30). Ultimately, the supreme court vacated and remanded for reconsideration and further findings and analysis. *Id*. at 527 (¶54).

¶38. This case, however, is distinguishable. Here, the Permit Board thoroughly explained its decision to issue the water quality certification in twenty-four pages of findings of fact and conclusions of law. Additionally, the Permit Board cited the parts of the record that it considered and relied on. Although the Permit Board may have used portions of MSPA's language, this does not necessarily mean that the Permit Board did not make its own findings of fact or conduct its own analysis. MDEQ reviewed the information that was initially submitted, requested public comments, and asked MSPA to revise its alternatives analysis. Furthermore, the Permit Board specifically stated that it considered the pre-filed written testimony, oral testimony, documents submitted into evidence, and arguments of legal counsel before entering its findings of fact. We agree with the chancellor that the Permit Board "went well above and beyond rubber stamping MSPA's analysis . . . ." The Permit Board's decision was supported by substantial evidence and was not arbitrary or capricious.

### IV. Whether the Permit Board erred by not requiring an environmental justice review.

¶39. Finally, the Appellants claim that the Permit Board erred by not requiring an environmental justice review before issuing the water quality certification.

¶40. During the evidentiary hearing, however, the Appellants' counsel acknowledged that

18

the Permit Board was not required to consider environmental justice. Counsel stated during closing arguments, "I know that environmental justice is not something that you [(the Permit Board)] have to . . . consider, but do consider it." "An appellant cannot complain on appeal of alleged errors which he invited or induced." *Campbell v. Jones*, 200 So. 3d 1126, 1128 (¶11) (Miss. Ct. App. 2016) (quoting *Busick v. St. John*, 856 So. 2d 304, 314 (¶25) (Miss. 2003)). Furthermore, the Permit Board was not required to ensure that an environmental justice review was conducted. Instead, the Corps, as a federal agency, was required to comply with Executive Order 12898 and address environmental justice.

¶41. Additionally, the community was afforded multiple opportunities for meaningful public involvement during the administrative process, which is "the most important consideration in an environmental justice review. . . ." *Hinds County v. Miss. Comm'n on Env't Quality*, 61 So. 3d 877, 886 (¶33) (Miss. 2011). Bass testified that MDEQ reviewed the project with sensitivity to the area and considered community concerns, solicited comments regarding the proposed project and conducted a public hearing, implemented enhanced community engagement, provided the community's comments to the Permit Board, and MSPA designed the project to be environmentally protective of the community.

¶42. The Appellants cite *Hinds* in support of their argument. In *Hinds*, a county amended their waste-management plan and submitted it to the Mississippi Commission on Environmental Quality for approval. *Id*. at 879 (¶1). "The Commission's statutory responsibilities with regard to approving a county's waste-management plan are listed in

19

Mississippi Code [Annotated] sections 17-17-225 to 17-17-229." *Id*. at 881 (¶12). Although the Commission "considered the issue of environmental justice," it noted that the issue would "also be considered by . . . the Permit Board." *Id*. at 886 (¶36). On appeal, the supreme court held "the concept of environmental justice . . . fits within the criteria that the Permit Board must consider . . . ." *Id*. (citing Miss. Code Ann. § 17-17-229). However, the statutory and regulatory scheme in this case was different. This case involved a water quality certification, not a waste-management plan. As discussed, the Permit Board was required to consider eleven factors in deciding whether to grant the water quality certification. None of these factors included environmental justice. For these reasons, the Permit Board's failure to conduct an environmental justice review before issuing the water quality certification was not erroneous.

**CONCLUSION**

¶43. The Permit Board's decision to issue the water quality certification was supported by substantial evidence, it was not arbitrary or capricious, it was within the Permit Board's authority to make, and it did not violate the Appellants' statutory or constitutional rights. Therefore, we affirm the Harrison County Chancery Court's judgment.

¶44. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J.**

**McDONALD, J., DISSENTING:**

20

¶45. I dissent from the majority's holding that the public notice was sufficient, that the Permit Board sufficiently considered all factors, and that the grant of the permit was not arbitrary and capricious. Instead, I would find that MDEQ's public notice was not sufficient to inform stakeholders of the potential risks posed by the project (i.e., the storage of explosive ammunition), and as such, the trial court erred in its holdings listed above. Further, while the majority finds that the Permit Board accomplished the "most important consideration for an environmental justice review" by allowing for meaningful public involvement, I disagree. I would instead find that the Permit Board did not consider any of the factors that would have satisfied a meaningful environmental justice review.

## I. MDEQ's public notice was deficient.

¶46. In 2008, an investigation into the site found excessive lead and arsenic in the soil and groundwater in the area. A "Corrective Action Plan and Environmental Covenant" was developed, which called for the removal of soil and capping of contaminants under 10 inches of clay behind a marked fence. This covenant requires successors (in this case, MSPA) to obtain permission before carrying out activities that may cause these contaminants to become exposed or migrate off of the site. The area where this corrective action was taken is located adjacent to the area where the offloading and storage of DOD shipments are proposed to take place, including the possible receipt and storage of up to 188 tons of 1.1 explosive ammunition.

¶47. MDEQ regulations lay out the requirements for water and air permit applications.

These regulations state:

> To be deemed complete by the Department, all applications for certification shall at a minimum contain the information that follows:
> . . . .
> (3) a description of all proposed discharges *and/or other activities associated with the proposed activity*, including planned or proposed future development by the applicant[.]

11 Miss. Admin. Code Pt. 6, R. 1.3.2 (emphasis added). However, in the description of the proposed military project, the joint public notice simply states:

> WORK DESCRIPTION: The applicant proposes filling 3.15 acres of wetlands for the creation of a rail spur, staging lots, and *a security fence in support of* [*DOD*] *shipments*. The applicant is seeking a 5-year authorization.

The notice does not, with any particularity, describe what these DOD shipments might contain.

¶48. However, in the administrative record for this case, within a document labeled "SDDC Strategic Seaport Infrastructure Criteria," there is a list of systems and subsystems that are either necessary or preferred for a seaport to be classified as a "Strategic Seaport" like the Port of Gulfport. This list includes the "[c]apability (preferred) to handle 3,500 to 377,000 lbs of net explosive weight (e.g. 1-74 TEUs) of 1.1 ammunition at one staging area and one berth." Federal regulations classify Division 1.1 ammunition as one of many types of "dangerous cargo." 33 C.F.R § 126.3. In particular, they are defined as "explosives that have a mass explosion hazard. A mass explosion is one which affects almost the entire load instantaneously." 49 C.F.R. § 173.50(b)(1). In other words, one of the preferred criteria for strategic seaports is the ability to receive and store up to 188 tons of explosives that are

22

considered by the federal government to pose a threat of a "mass explosion" event.

¶49.    While our State has very little caselaw on the amount of detail necessary for a public

notice to be deemed sufficient, the Texas Court of Appeals has dealt with the issue, stating:

> The relevant inquiry for determining whether an agency's notice satisfies the APA's notice requirement is whether the agency's notice fairly apprises affected parties of the pertinent issues to allow them to comment and participate in the rulemaking process in a meaningful and informed manner.

*Low Income Consumers v. Pub. Util. Comm'n of Texas*, No. 03-18-00364-CV, 2020 WL

2071753, at *5 (Tex. Ct. App. Apr. 30, 2020) (internal quotation marks omitted).  This

standard is also reflected in various other jurisdictions throughout the United States.  "These

procedural requirements ensure fairness by providing public notice, an opportunity for all

interested parties to be heard, full factual development and the opportunity for continuing

comment on the proposed action before a final determination is made."  *Aluli v. Lewin*, 828

P.2d 802, 804 (Haw. 1992); *see also 613 Corp. v. New Jersey*, 510 A.2d 103, 110 (N.J.

Super. Ct. App. Div. 1986) ("Specifically, this court has held that the purpose behind the

notice requirement of [the public notice statute] is fairly and sufficiently to apprise those who

may be affected by the proposed action of the nature and character of the proposed action so

as to enable them to prepare intelligently for the hearing."  (quoting *Lauver v. Planning and

Zoning Comm'n of Town of Canterbury*, 760 A.2d 513, 510 (Conn. Ct. App. 2000))).

¶50.    In the case at hand, the majority argues that the notice is not deficient simply because

it "did not mention the single reference" to the possibility of storing approximately 188 tons

of highly explosive materials adjacent to a site that is currently being used to prevent lead and

23

arsenic from being released into the waters of the State next to an environmental justice community. I disagree. The regulations clearly state that the notice is required to state "a description of all proposed discharges *and/or other activities associated with the proposed activity*." (Emphasis added). The strategic port criteria state that the port should preferably be able to receive and store up to 188 tons of explosive ammunition. This clearly is an activity "associated with the proposed activity" of receiving and storing DOD shipments. Further, I believe the possibility of storing such highly explosive ammunition near such a site to be a "pertinent issue" of which the nearby community should have been informed in the public notice so as to "participate in the rulemaking process in a meaningful and informed manner."

¶51. Because this significant information was not included in the public notice, I would find that the notice was deficient, and as such, the trial court should have reversed the Permit Board's issuance of the water permit. Furthermore, because the notice was deficient, the Permit Board's factual findings regarding possible storage of explosive ammunition were, by definition, incomplete and in error. Lastly, because the Permit Board failed to provide sufficient notice to the community to make meaningful and informed public comments that in turn would have led to sufficient consideration of the explosive ammunition issue, the Permit Board cannot be said to have articulated a rational basis for its decision regarding the North Port Property being preferable to the alternative project sites. For these reasons, I would find that the trial court erred on these three issues.

24

## II. Environmental Justice

¶52. The majority determines that because the Permit Board allowed public involvement through its holding of a public hearing, the purpose of an environmental justice review was accomplished. I again disagree.

¶53. Executive Order 12898 states:

> [E]ach Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States[.]

59 F.R. 7629, Exec. Order No. 12898 (Feb. 11, 1994). Based on this executive order, the EPA, as part of an interagency working group, defined environmental justice as

> [t]he fair treatment of people of all races, cultures, incomes and educational levels with respect to the development, implementation and enforcement of environmental laws, regulations and policies. Fair treatment implies that no population of people should be forced to shoulder a disproportionate share of the negative environmental impacts of pollution or environmental hazards due to a lack of political or economic strength.

Sandra Richardson, *Environmental Justice: A Tool for Community Empowerment*, 27-Dec. Colo. Law. 55, 55 (1998). The majority is correct in pointing out that while federal agencies and some state agencies are required to consider environmental justice factors in their rulemaking, the Permit Board is not.

¶54. The Supreme Court in *Hinds County v. Mississippi Commission on Environmental Quality*, 61 So. 3d 877 (Miss. 2011), stated that when a county evaluates a proposed landfill site "the *most important* consideration in an environmental justice review" is meaningful

public involvement. *Id*. at 886 (¶33). But even in *Hinds County*, it was not the *only* consideration. *Id*. In *Hinds County*, the court also considered the fact that the county hired an environmental firm to conduct an environmental justice review of the proposed landfill. *Id* at (¶34). In the firm's review, it considered the demographics of the area as part of its evaluation, and ultimately concluded that the landfill would have "relatively minor impact" on the area, and thus "fully compl[ied] with environmental justice goals." *Id*. Even with that record, however, the Supreme Court held that the Permit Board was required to conduct a more in-depth environmental justice review than the county had. *Id*. at (¶36). No such in-depth, outside review was conducted in this present case. Instead, the Permit Board relied solely on a cursory review by Bass, an internal employee for MDEQ, who claimed that MDEQ reviewed the project with sensitivity to the area and considered community concerns by: (1) soliciting comments regarding the proposed project, (2) conducting a public hearing, (3) implementing enhanced community engagement, (4) providing community comments to the Permit Board, and (5) designing the project to be environmentally protective of the community.

¶55. In *Hinds County*, our Supreme Court recognized and agreed with the federal standard for environmental justice reviews, stating "environmental justice" is about "ensur[ing] the fair treatment and meaningful involvement of all people, regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies." *Id*. at (¶31). MDEQ, through Bass, did not

26

make any findings regarding the race, color, national origin, or income of the surrounding community. Accordingly, it cannot be said that MDEQ ensured fair treatment and meaningful involvement of such groups.

¶56. An environmental justice review, by its very design, is something more than the standard rule-making process because environmental justice reviews are meant to give additional consideration to projects proposed within communities that have historically been damaged by environmental degradation. To say that the Permit Board met environmental-justice-review requirements by simply conducting a rule-making hearing would be to reduce the standard of environmental justice reviews down to the bare necessities of the rulemaking process, i.e., public involvement.[7] This would defeat the purpose of environmental justice reviews entirely.

¶57. Accordingly, I respectfully dissent.

**WESTBROOKS, J., JOINS THIS OPINION.**

---

[7] Due to the deficient public notice, any public involvement was meaningless, as the public could not be said to have been meaningfully informed, as required for environmental justice reviews.